## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DEMETRIA C.,**[1]               ) | |
|                    ) | |
|         **Plaintiff,**        ) | |
|                    ) | |
| **v.**                      ) | **Case No. 24-cv-02975 (GMH)** |
|                    ) | |
| **FRANK BISIGNANO, Acting**    ) | |
| **Commissioner of Social Security,**[2]   ) | |
|                    ) | |
|                    ) | |
|         **Defendant.**       ) | |
|                    ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Demetria C. brought this action seeking to reverse the final decision of the Acting Commissioner of Social Security, Frank Bisignano ("Defendant" or "Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") benefits and Disability Insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g). Plaintiff alleges that the Administrative Law Judge ("ALJ") erroneously assessed her residual functional capacity ("RFC") in three distinct ways: (1) the ALJ failed to properly account for Plaintiff's moderate limitations in concentration, persistence, or pace; (2) the ALJ's narrative discussion failed to create a logical bridge between the ALJ's RFC determination and specific medical or nonmedical evidence used to support his determination; and (3) the ALJ's RFC assessment failed to address

---

[1] Plaintiff's name has been partially redacted in accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf [https://perma.cc/N9T2-U5XG].

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the current Defendant has been substituted in place of his predecessor. *See* Fed. R. Civ. P. 25(d).

Plaintiff's inability to leave her home due to anxiety. Plaintiff seeks reversal of the Commissioner's decision on these grounds. The Commissioner argues that the ALJ correctly determined Plaintiff's RFC and his decision should be affirmed because it is supported by substantial evidence. Based on the parties' arguments and review of the record,[3] the Court will affirm the ALJ's decision. The ALJ properly accounted for Plaintiff's limitations in concentration, persistence, and pace in his RFC assessment; the ALJ's narrative discussion logically bridges the medical evidence to his RFC assessment; and although the ALJ may have erred in failing to sufficiently address Plaintiff's assertion that she does not go outside in his RFC assessment, any such error was harmless.

A separate order will issue.

## I.     BACKGROUND

### A.     Statutory and Regulatory Framework

To be eligible for SSI benefits under the Social Security Act, the Social Security Administration must find a claimant to be "disabled," meaning that the individual is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To make that determination, an ALJ gathers evidence, holds a hearing, takes testimony, and performs the following five-step, sequential inquiry of the disability claim:

---

[3] The relevant docket entries for purposes of this Memorandum Opinion are: (1) the administrative record, ECF Nos. 6–7; (2) Plaintiff's motion for judgment of reversal, ECF No. 12; (3) Defendant's motion for judgment of affirmance and opposition to Plaintiff's motion for judgment of reversal, ECF Nos. 15–16; and (4) Plaintiff's opposition to Defendant's motion for judgment of affirmance and reply to Defendant's opposition, ECF Nos. 17–18. The page numbers cited herein are those assigned by the Court's CM/ECF system.

Step one:  whether the claimant is engaging in "substantial gainful activity";[4]

Step two:  whether the claimant has a "severe" medically-determinable physical or mental impairment or combination of impairments;[5]

Step three:  whether the claimant's impairment is equivalent to one of the disabling impairments listed in the appendix of the relevant regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listings");

After step three, the ALJ determines the claimant's residual functional capacity ("RFC")—i.e., the most he or she is able to do notwithstanding his or her physical and mental limitations;

Step four:  whether the impairment prevents the claimant from performing his or her past relevant work;[6] and

Step five:  whether the claimant, in light of his or her age, education, work experience, and RFC, is unable to perform another job available in the national economy.[7]

*See* 20 C.F.R. § 416.920; *see also* 20 C.F.R. § 404.1520 (outlining the five-step sequential inquiry for DIB claims); *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004).  "An affirmative answer

---

[4] "Substantial gainful activity" is work that "involves doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit."  20 C.F.R. § 416.910; *see also* 20 C.F.R. § 404.1510 (defining "substantial gainful activity" for the purposes of Social Security disability insurance benefits ("DIB") claims).  "If [the claimant is] doing substantial gainful activity, [the Social Security Administration] will find that [the claimant is] not disabled." 20 C.F.R. § 416.920(a)(4)(i); *see also* 20 C.F.R. § 404.1520(a)(4)(i) (defining the step one inquiry for DIB claims).

[5] An impairment or combination of impairments is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "seeing, hearing, [or] speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; or "[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.922; *see also* 20 C.F.R. § 404.1522 (defining a severe impairment for the purposes of DIB claims).

[6] "Past relevant work" is work "done within the past five years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 416.960(b)(1); *see also* 20 C.F.R. § 404.1560(b)(1) (defining "past relevant work" for the purposes of DIB claims).  If the claimant can perform his or her past relevant work, a finding of "not disabled" is required.  20 C.F.R. § 416.920(a)(4)(iv); *see also* 20 C.F.R. § 404.1520(a)(4)(iv) (defining the step four inquiry for DIB claims).

[7] At the fifth step, the ALJ may, "'[i]n the ordinary case, . . . resort[ ] to the applicable medical vocational guidelines'" (also known as "the grids") to determine whether the claimant is disabled. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.  "The grids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.'" *Id.* (alteration in original) (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)). However, when a claimant has additional limitations beyond those contemplated by the grids, the ALJ cannot rely on the grids alone to establish non-disability.  *Id.*  In such cases, the testimony of a vocational expert is generally required. *Smith v. Bowen*, 826 F.2d 1120, 1122 (D.C. Cir. 1987).

to question 1 or negative answers to questions 2 or 4 result in a determination of no disability. Affirmative answers to questions 3 or 5 establish disability." *Hines v. Bowen*, 872 F.2d 56, 58 (4th Cir. 1989) (citing 20 C.F.R. § 404.1520).

The claimant bears the burden of proof at the first four steps of the evaluation. *Callahan v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011). At step five, the burden shifts to the Commissioner to identify specific jobs available in the national economy the claimant can perform. *Id.* In making this determination, an ALJ may call a vocational expert ("VE") to testify at the hearing as to whether, based on the claimant's RFC, he or she can perform other work that exists in the national economy.[8] *Id.* at 90.

### B.    Plaintiff's Disability Claims and Procedural History

Plaintiff was born in September 1979 and has a sixth-grade education. ECF No. 6-3 at 12, 21; ECF No. 6-2 at 49. She first filed a DIB and SSI benefits application on April 10, 2018, which was denied. ECF No. 12 at 1. After an administrative hearing on June 18, 2020, her claims were again denied by decision dated July 6, 2020. *Id.* Review of this decision was denied by the Appeals Council and therefore became final on July 6, 2020. *Id.* Plaintiff filed her current application for DIB and SSI benefits on December 15, 2021, claiming disability status beginning on June 7, 2020,[9] due to a learning disability, schizophrenia, post-traumatic stress disorder, high blood pressure, and acid reflux. ECF No. 6-2 at 16; ECF No. 6-3 at 3. Plaintiff's claims were denied initially on March 21, 2022, and the denial was affirmed on April 29, 2022. ECF No. 6-2 at 16. On May

---

[8] In determining whether "unskilled, sedentary, light, and medium jobs exist in the national economy" that a claimant can perform, a VE may rely on the Dictionary of Occupational Titles, 20 C.F.R. § 404.1566(d)(1), which "provides a brief description of occupations within the national economy and lists the capabilities that each occupation requires of a worker." *Callahan*, 786 F. Supp. 2d at 90.

[9] Plaintiff's application initially alleged disability beginning on January 1, 2020, but Plaintiff clarified at the August 30, 2023, hearing that her date of alleged onset was July 7, 2020. ECF No. 6-2 at 16, 40, 44–45.

5, 2022, Plaintiff requested a hearing before an ALJ.  *Id.*  At the hearing, held on August 30, 2023, the ALJ took testimony from Plaintiff and a vocational expert.  *Id.* at 16, 24–25, 31.

Plaintiff testified that she was self-employed for a number of years and braided hair, *id.* at 45–46, and that she did not have any formal hairdressing training, *id.* at 47.  During the hearing, Plaintiff's attorney asserted that Plaintiff has an IQ of 62, is illiterate, and did not complete the sixth grade.  *Id.* at 48–50.  He further asserted that Plaintiff suffered from mental impairments including schizoid depression with command hallucinations; PTSD; bipolar depression; depressive disorder with and without psychotic features; panic attacks; paranoia; and auditory and visual hallucinations.  *Id.*  at 49.  He stated that Plaintiff's paranoia is so severe that she is unable to go outside.  *Id.*  Plaintiff testified that she does not go out of her home and that she did not know whether she had left her home since July 2020.  *Id.* at 56.  She said that her father goes grocery shopping for her and does her laundry, her medicine is delivered to her home, and "everybody comes" to her.  *Id.*  Plaintiff testified that she began having panic attacks in 2020 and gets them twice a month.  *Id.* at 55.  She further testified that she has blackouts about three times a month.  *Id.* at 58.  Plaintiff testified that she spends all day in bed and has complications from a past shooting, including acid reflux and not being able to sit for very long.  *Id.* at 59–61.  Additionally, Plaintiff's attorney asserted that Plaintiff suffers from physical impairments including syncope; blackouts; and finger locking, "preventing her from using her fingers."  *Id.* at 49–50; 60–61.

The vocational expert testified that Plaintiff's past work experience as a hair braider was most similar to that of a Personal Attendant, which is a semi-skilled job performed at a light exertional level.[10]  *See id.* at 46–48.  The ALJ asked the vocational expert whether a person of the same

---

[10] Under the Social Security regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," as well as "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls"; "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds"; and "[h]eavy work

age and educational level could perform Plaintiff's past work as a Personal Attendant, provided

that such individual "had the ability to perform a full range of all physical work up to and including

very heavy work" and that such work would "not require performing more than simple, one to

two-step routine, repetitive tasks in a low-stress work environment." *Id.* at 50–51. The ALJ de-

fined a "low-stress work environment" as

> requiring only occasional decision making and occasional changes in the work set-
> ting, where there would only be occasional contact with coworkers and supervisors,
> and no contact with the general public, and which would not require a fast pace or
> production quotas, such as work customarily to be found on an assembly line.

*Id.* at 51. The VE testified that an individual with that background and those limitations could not

perform Plaintiff's past work. *Id.* But the VE testified that other work would be available for such

a person. *Id.* Specifically, the VE testified that such a person could work as a Dishwasher, a

Custodian, or a Warehouse Worker. *Id.* The VE testified these jobs were all unskilled, performed

at the medium exertion level, and had a specific vocation preparation (SVP) of medium or 2.[11] *Id.*

The ALJ asked the VE the "reading, math, and language codes for . . . those three jobs." *Id.* at 51–

52. The VE testified that all of the jobs would require a reasoning level 2 and a math and language

level 1. *Id.* at 52. The ALJ noted that a reasoning level of 2 "indicates applying common sense

and understanding to carry out detailed but uninvolved written or oral instructions, [and] deal with

problems involving a few concrete variables on or from standardized situations," which he sug-

gested appeared inconsistent with "a limitation to simple one to two-step routine, repetitive tasks."

*Id.* at 52–53. The ALJ then asked, given the hypothetical posed, whether there are jobs available

---

involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50
pounds." 20 C.F.R. §§ 404.1567(b)–(d), 416.967(b)–(d).

[11] "SVP" stands for "[s]pecific vocational preparation," a term "used within the DOT to define the time generally
required to learn certain skills for particular jobs." *Tiana O. v. Kijakazi*, No. 20-cv-2051, 2023 WL 5348747, at *13
n.13 (D.D.C. Aug. 21, 2023). An SVP of 1–2 corresponds to unskilled work, 3–4 corresponds to semi-skilled work,
and 5–9 corresponds to skilled work. *See id.*

with a reasoning level 1, math level 1, and language level 1.  *Id.* at 53.  The VE testified that a person with these limitations could work as a Housekeeper, *id.* at 53, a Field Crop Harvest Worker, or a Street Cleaner, *id.* at 64.  The VE testified that if such an individual was off task more than 10 percent of the day or missed more than one day per month there would be no jobs available.  *Id.* at 54.

### C.    The ALJ's Decision

The ALJ issued his decision denying benefits on November 9, 2023.  *Id.* at 32.  That decision became final when the Appeals Council denied Plaintiff's request for review on August 22, 2024.  ECF No. 12 at 2.

The following summary of the ALJ's decision focuses on information relevant to Plaintiff's arguments for remand, which concern primarily the ALJ's RCF assessment.  *See generally id.* at 3–18 (Plaintiff's opening brief).

#### 1.    Substantial Gainful Employment, Severe Impairments, and the Listings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2020.[12]  ECF No. 6-2 at 19.  At step two, the ALJ found that Plaintiff had the following severe impairments:  "a mental impairment variously diagnosed as psychoactive substance abuse, bipolar disorder with psychotic features, [and] other stimulant abuse."  *Id.*  The ALJ found that Plaintiff had the following non-severe impairments:  "right elbow pain, bilateral foot callus, headache, hypertension, urinary tract infection, viral syndrome, abdominal pain and gastritis, dermatitis, and bronchitis."  *Id.*  The ALJ noted that although Plaintiff's medical history contained evidence of a schizophrenia diagnosis from 2018, her more recent

---

[12] As explained in note 9, *supra*, Plaintiff's alleged onset date was actually July 7, 2020.  ECF No. 6-2 at 16, 40, 44–45.  This error is harmless.

medical records did not include a schizophrenia diagnosis, but instead diagnosed her with bipolar disorder with "psychotic features." *Id.* at 20. As such, the ALJ found that evidence in the record did not establish that schizophrenia was a current medically determinable impairment. *Id.* Similarly, although Plaintiff alleged symptoms of PTSD, including nightmares and flashbacks, the ALJ found that the condition did not constitute a medically determinable impairment because it had not been formally diagnosed or corroborated by medically acceptable clinical findings. *Id.* Nonetheless, the ALJ noted that had he considered PTSD and schizophrenia severe impairments, the limitations of his RFC assessment would not have changed. *Id.*

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of any of the impairments in the listings, either alone or in combination. *Id.* at 20–21. Specifically, the ALJ considered the "paragraph B" criteria, which are satisfied if a claimant's mental impairments "result in one extreme limitation or two marked limitations in a broad area of functioning."[13] *Id.* at 21; *see* 20 C.F.R. Part 404, Subpt. P. App. 1 § 12.00. The ALJ found that Plaintiff had a "moderate limitation" in her ability to "understand, remember, and apply information." ECF No. 6-2 at 21–22. In so finding, the ALJ noted that Plaintiff reported a history of special education during her childhood and that the mental status examinations in the record documented "variable memory function," with impaired memory during some medical appointments but intact memory during others. *Id.* at 21. The ALJ noted that he considered Plaintiff's 2018 intelligence testing, but concluded based on all the evidence in the record that she was not completely illiterate. *Id.* Specifically, the ALJ found that Plaintiff's testimony that she was previously

---

[13] For a person to be disabled due to a psychological condition, the condition "must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00.a.2.b. An individual has an "extreme" limitation when he or she cannot function in an area of mental functioning "independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00.F.2.e. A "marked" limitation is characterized by a "serious[] limitation" in the ability to function in a particular area "independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00.F.2.d.

self-employed, cared for her son who has a disability, and attended school until the sixth grade;

evidence that suggested she discussed studying for the GED and looking up information online;

medical records that described her as "moderately literate"; and records from a case manager that

noted she was not able to "read things with ease," supported a finding that Plaintiff "has a limited

ability to read and a marginal education." *Id.* The ALJ also considered Plaintiff's claim that she

does not perform household chores, shopping, or cooking, or manage her weekly calendar, because

others perform those tasks for her but noted that these claims were at times contradictory and

difficult to evaluate because "it begs the question whether [Plaintiff] could perform those tasks

were she not benefitting from the beneficence of others." *Id.* As such, the ALJ found Plaintiff had

a "moderate limitation" in her "ability to understand, remember, and apply information." *Id.* at

21–22.

The ALJ found Plaintiff had a "moderate limitation . . . interacting with others" because,

although her records show that she reported fighting with others, she testified that she interacts

with members of her family and her case manager. *Id.* at 22.

The ALJ found Plaintiff had a "moderate limitation" in "concentrating, persisting[,] or

maintaining pace." *Id.* at 22. In coming to this conclusion, the ALJ observed that Plaintiff's

memory function varied throughout the relevant period with some mental examinations showing

intact attention, despite her ongoing allegations of concentration issues. *Id.* Further, the ALJ noted

that the record showed Plaintiff listened to music, watched television, and used social media, ac-

tivities which "require some intact capacity to pay attention." *Id.*

The ALJ also found that Plaintiff had a "moderate limitation" in "adapting and managing

oneself." *Id.* He observed that the record established a history of substance abuse, traumatic ex-

perience, and limited education. *Id.* He noted that in a questionnaire from January 2022 Plaintiff

reported not leaving her house and performing no chores activities or shopping, but that a prior administrative law judge decision referenced her ability to live independently, use public transportation, and perform household tasks, meals, and shopping. *Id.*

In conclusion, the ALJ found that Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation and therefore "paragraph B" criteria were not satisfied. *Id.* at 23. Nor did the ALJ find that "paragraph C" criteria were satisfied because the "record [did] not support the conclusion that [she] retain[ed] only minimal capacity to adapt to changes in her environment or to demands not already part of [her] daily life." *Id.* For example, the ALJ noted that the record did not document any history of psychiatric hospitalization, but rather showed that Plaintiff's symptoms improved with a treatment of medication management and psychotherapy. *Id.*

### 2. Plaintiff's RFC

Given the Plaintiff's mental limitations, the ALJ found that Plaintiff had the RFC to perform "a full range of work at all exertional levels," but had the following nonexertional limitations:

> [Plaintiff] is limited to no more than simple 1-2 step, routine, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, where there would only be occasional contact with co-workers and supervisors, and no contact with the general public, and which would not require a fast pace or production quotas such as would customarily be found on an assembly line.

ECF No. 6-2 at 23. In formulating Plaintiff's RFC, the ALJ considered Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical and other evidence, as well as the medical opinions and prior administrative medical findings. *Id.* The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's symptoms, but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence

and other evidence in the record." *Id.* at 25.

With respect to Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms, the ALJ found that Plaintiff's subjective allegations were not supported by "mental status examination findings," her "PHQ-2 and PHQ-9 scores,"[14] or "the observations of her healthcare providers." *Id.* Similarly, the ALJ found that Plaintiff's statements to medical providers regarding her specific diagnoses and symptoms and psychiatric hospitalizations were inconsistent. *Id.* For example, the ALJ noted that Plaintiff told a social worker that she was diagnosed with schizophrenia in 2018, but later reported that she was diagnosed in 2013. *Id.*; *see* ECF No. 7-2 at 257; ECF No. 7-5 at 38. Further, although she had reported that she received mental health care in 2013 and 2018, in 2020, Plaintiff reported to a different social worker that she had not previously received mental health services. ECF No. 6-2 at 25; *see* ECF No. 7-2 at 258. Similarly, in 2020, Plaintiff told a social worker that she had been hospitalized "years ago" for a period of two months due to cutting her wrist, but in 2022, she told a social worker that she had only been hospitalized overnight. ECF No. 6-2 at 25. Further, the ALJ noted that medical evidence in the record did not corroborate either of Plaintiff's claims as to psychiatric hospitalizations. *Id.* The ALJ found that Plaintiff's assertions to healthcare providers were similarly inconsistent. *Id.* For example, the ALJ noted that Plaintiff's testimony that she experiences command hallucinations and auditory and visual hallucinations aligns with complaints she made to staff at MBI Health Services, LLC, and The Ark of DC, but not with complaints she made to Unity Healthcare. *Id.* at 25–26. Additionally,

---

[14] These are mental health diagnostic tools. *See* Kurt Kroenke, et al., *The PHQ-9*, 16 J. Gen. Intern. Med. 606, 606–13 (Sept. 2001) ("The Patient Health Questionnaire (PHQ) is a 3-page questionnaire that . . . assesses 8 diagnoses, divided into threshold disorders . . ."); *see also Long v. Colvin*, No. 16-cv-5089, 2017 WL 2889367, at *1 (E.D. La. July 7, 2017) (describing the PHQ-9 as "a tool for assisting primary care clinicians in diagnosing depression as well as selecting and monitoring treatment" (quoting *Luckett v. Astrue*, No. 09-cv-5211, 2011 WL 336250, at *3 (W.D. Ark. Jan. 31, 2011))); *Salina S. v. Kijakazi*, No. 20-cv-515, 2022 WL 3700880, at *5 (D. Idaho Aug. 25, 2022) (describing the PHQ-2 as "a brief depression screening").

although Plaintiff complained of experiencing regular hallucinations to staff at MBI Health Services and The Ark of DC, the examinations from those hospitals found no hallucinations or only "some abnormality." *Id.* at 26.  The mental status examinations from Unity Health Care "consistently observed 'good' judgment and insight, intact memory, and appropriate mood and affect, with no reference to psychotic symptoms during appointments." *Id.*  Likewise, records from United Medical Center in 2021 noted that Plaintiff made no complaints of psychiatric symptoms. *Id.*  The ALJ also found it relevant that the record showed Plaintiff did not seek emergency medical care for any psychiatric symptoms during the relevant period, although she did seek emergency medical care for physical discomfort. *Id.*  The ALJ noted that certain medical records noted "poor" to "fair" ratings for insight and judgment and displayed Plaintiff's impaired memory during testing, which were accounted for in determining Plaintiff's "moderate" limitation in functioning. *Id.*

The ALJ also noted that Plaintiff's conservative treatment and lack of hospital visits to treat her mental impairments suggest her symptoms are controllable "so long as she complies with her prescribed treatment." *Id.* at 27.  The ALJ further observed that Plaintiff was prescribed Olanzapine, Fluoxetine, and Wellbutrin during the relevant period and reported her medications being effective and not causing side effects. *Id.*  The ALJ relied on Plaintiff's treatment notes that similarly showed that her symptoms improved following the prescribed treatments. *Id.* at 28. This, the ALJ found inconsistent with Plaintiff's allegations of severe psychiatric symptoms. *Id.* at 27, 28.

Additionally, the ALJ noted that there was a pattern in the records of Plaintiff's allegations of her symptoms being more extreme than "observed by her healthcare providers in their respective examinations." *Id.* at 27.  For example, although Plaintiff testified that she does not leave her house, the ALJ observed that she reported to a medical provider that she left her house in June

2021 to celebrate Father's Day. *Id.* The ALJ also noted that Plaintiff's assertion that she is unable to carry out everyday activities or go outside is unsupported and inconsistent with mental examinations in the record and observations of medical and mental healthcare providers. *Id.* at 28. Instead, he observed that the "evidence does not clearly establish that [Plaintiff] is unable to go outside; rather, she has others go on her behalf." *Id.* The ALJ relied again on the record evidence showing she left her house on Father's Day 2021 to find that the "non-performance of these activities may be voluntary." *Id.*

In addition to treatment notes from MBI Health Services and the Ark of DC, medical records from Unity Healthcare and United Medical Center, and Plaintiff's subjective assessment of her symptoms, the ALJ also relied on the medical opinion evidence of two state agency psychological consultants (Drs. Heiser and Cott) and two state agency medical consultants (Drs. Nelson-Desiderio and Haim) in determining Plaintiff's RFC. *Id.* at 29. Doctors Heiser and Cott relied on Plaintiff's mental health records and primary care records and both opined that the evidence supported "moderate" psychiatric limitations. *Id.* The ALJ found their opinions persuasive. *Id.*

### 3. Past Relevant Work and Other Jobs Available in the National Economy

At step four, the ALJ made no finding with respect to whether Plaintiff could perform past relevant work because there was insufficient evidence in the record about her past work. *Id.* at 30. Proceeding to step five, the ALJ relied on the testimony of the VE to find that Plaintiff "could perform the requirements of the representative occupations such as . . . [a] Housekeeper . . . , Field Crop Harvest Worker . . . , and Street Cleaner." *Id.* at 31. As such, the ALJ concluded that Plaintiff was not disabled from the date of onset to the date of the decision. *Id.* at 31–32.

## II.    LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner. 42 U.S.C. § 405(g). A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and a correct application of the relevant legal standards. *Id.*; *Butler v. Barnhart*, 353 F.3d at 999.

"[T]he plaintiff bears the burden of demonstrating that the Commissioner's decision is not based on substantial evidence or that incorrect legal standards were applied." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It requires "more than a scintilla [of evidence], but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)). Ultimately, the substantial evidence standard is a "low bar," *La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021), and "requires considerable deference to the decision rendered by the ALJ," *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [under the substantial evidence standard] is not high.").

The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." *Crosson*, 907 F. Supp. at 3; *see also Butler*, 353 F.3d at 999 (district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are "based on substantial evidence and a correct application of the law"). However, "this standard of review requires the Court to carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of

the evidence available and has sufficiently explained his/her reasoning and the weights given to the facts." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth*, 437 F. Supp. 2d at 65 ("[T]his standard of review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits[.]'" (second alteration in original) (quoting *Butler*, 353 F.3d at 999)).  In applying this standard, courts "must also be mindful of the harmless-error rule.  Consequently, even if [the court] perceive[s] error," it must "affirm the Commissioner's decision unless the error is prejudicial." *Saunders v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021).

Finally, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill*, 246 F. Supp. 3d 202, 210 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill*, No. 16-cv-1671, 2017 WL 4326388, at *5 (D.D.C. Sept. 28, 2017).  *See also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery*, 332 U.S. at 196).

## III.    DISCUSSION

Plaintiff contends that the ALJ failed to properly assess Plaintiff's RFC.  First, Plaintiff argues that the ALJ failed to fully account for the Plaintiff's moderate limitations in concentration, persistence, or pace ("CPP") by limiting Plaintiff's RFC to only simple, routine, and repetitive tasks.  ECF No. 12 at 6–12.  Specifically, Plaintiff asserts the ALJ failed to adequately address how these restrictions accounted for limitations in CPP by either including RFC limitations beyond the "simple, routine, and repetitive tasks" restriction, or "explain why, notwithstanding the

moderate concentration, persistence, or pace limitation, the Plaintiff's overall limitations do not

affect his capacity to *sustain* simple, routine, or unskilled work." *Id.* at 8 (emphasis added). Next,

Plaintiff argues that the ALJ's narrative discussion section failed to create a logical bridge between

his RFC assessment and specific medical facts and nonmedical evidence. *Id.* at 12–15. Last,

Plaintiff argues that the ALJ failed to address Plaintiff's inability to leave her home due to anxiety

in his RFC assessment. *Id.* at 15–19. The Commissioner contends that the ALJ's decision is

supported by substantial evidence and should be affirmed. *See* ECF No. 15 at 12–20.

  For the reasons stated herein, the ALJ's decision will be affirmed.

**A. The ALJ Properly Accounted for Plaintiff's "Moderate" CPP Limitations in Plaintiff's RFC**

  Plaintiff argues that the ALJ's RFC assessment did not properly account for her "moderate"

limitations in concentration, persistence, and pace. ECF No. 12 at 6–12. The Commissioner ar-

gues that the ALJ's RFC assessment is supported by substantial evidence and properly accounted

for Plaintiff's moderate CPP limitations. ECF No. 16 at 13, 15–20.

  The RFC is the most that a claimant can still do despite her limitations. 20 C.F.R. §

404.1545(a)(1). The CPP domain "refers to the [claimant's] abilities to focus attention on work

activities and stay on-task at a sustained rate." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00(E)(3).

Here, the ALJ found that Plaintiff has a "moderate" CPP limitation. ECF No. 6-2 at 22. In SSA

parlance, a "moderate" limitation means that the claimant's "functioning in this area inde-

pendently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt.

P, App. 1 § 12.00(F)(2)(c). Though the SSA regulations do not define "fair," as this Court has

previously explained, "a moderate limitation" in maintaining CPP "'necessarily establishes some

deficit in the claimant's ability to sustain focused attention and concentration long enough to per-

mit the timely and appropriate completion of tasks commonly found in work settings.'" *Nsiah v.*

*Saul*, No. 19-cv-42, 2020 WL 12948519, at *14–16 (D.D.C. May 12, 2020) (citation modified) (quoting *Terri D. v. Berryhill*, No. 17-cv-22, 2018 WL 4688740, at *8 (W.D. Va. Sept. 28, 2018)); *see also Demetria R. v. Kijakazi*, No. 20-cv-3227, 2022 WL 3142376, at *14 (D.D.C. June 30, 2022), *report and recommendation adopted*, 2022 WL 3139026 (D.D.C. Aug. 5, 2022).

Based on the ALJ's finding that Plaintiff has a "moderate" CPP limitation, and on other nonexertional limitations not at issue here, *see* ECF No. 6-2 at 21–23, the ALJ limited Plaintiff's RFC to the performance of:

> simple, 1-2 step routine, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, where there would only be occasional contact with co-workers and supervisors, and no contact with the general public, and which would not require a fast pace or production quotas such as would customarily be found on an assembly line.

*Id.* at 23.

When formulating a plaintiff's RFC,

> an ALJ may be found to have adequately accounted for a plaintiff's moderate CPP limitation either (1) by including additional limitations in the RFC relevant to the CPP domain beyond unadorned simple, routine, and repetitive tasks (or its equivalent) restriction, or (2) by adequately explaining why, notwithstanding the moderate CPP limitation, the plaintiff's overall limitations do not affect his or her capacity to sustain simple, routine, or unskilled work.

*Shea M. v. Kijakazi*, No. 21-cv-2204, 2023 WL 3040602, at *18 (D.D.C. Apr. 21, 2023) (citation modified) (quoting *Terri D.*, 2018 WL 4688740, at *8).  Here, the ALJ has done both.

1.    The ALJ Included Additional Limitations to Account for Plaintiff's Moderate CPP Limitations

Many ALJs attempt, like the ALJ in part did here, to account for "moderate" CPP limitations by restricting the claimant's RFC to simple, routine, unskilled, and/or repetitive work (or some derivation of those limitations).  These attempts to account for moderate CPP limitations have received mixed reviews by federal courts.  *Contrast, e.g.*, *Patrice V. v. Saul*, No. 18-cv-2221,

2019 WL 3778771, at *5 (D. Md. Aug. 12, 2019) (finding that limiting the claimant to one to four step routine, repetitive tasks did not, without further explanation, sufficiently address moderate CPP limitations), *and Eichelberger v. Colvin*, No. 16-cv-3299, 2018 WL 2740018, at *2 (D. Md. Apr. 12, 2018) (similar), *with, e.g.*, *Taft W. v. Saul*, No. 19-cv-2781, 2020 WL 7074628, at *4 (D. Md. Dec. 3, 2020) (finding that limiting claimant to one to four step routine, repetitive tasks adequately addressed moderate CPP limitations), *and Stout v. Colvin*, No. 14-cv-2596, 2015 WL 7351503, at *12 (D. Md. Nov. 20, 2015) (similar).  This is because an RFC that a claimant "can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016) (finding that, generally, limiting a claimant to "simple, routine, and repetitive tasks" is insufficient to address moderate CPP limitations because "the ability to perform simple tasks differs from the ability to stay on task" (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015))).  Stated differently, "someone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be." *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020); *see also Johnson v. Saul*, No. 19-cv-3829, 2021 WL 411202, at *5 (D.D.C. Feb. 5, 2021) ("As numerous courts have noted, . . . the problem with finding a moderate CPP limitation by requiring 'simple, routine, and repetitive tasks' is that such a restriction, without more, does not actually address plaintiff's mental impairments because the difficulty of a task does not necessarily say anything about his ability to concentrate on it.").

Plaintiff has not—and could not—argue that the RFC is completely devoid of functional limitations relevant to CPP.  *See Teresa D. v. Bisignano*, No. 24-cv-2864, 2025 WL 2255216, at *10 (D.D.C. Aug. 7, 2025) (finding an RFC limiting the claimant to performing simple tasks and only occasional decision making and occasional changes in the work setting was a limitation

relevant to CPP); *Yamise R. v. Kijakazi*, No. 21-cv-3059, 2023 WL 7074088, at *10 (D.D.C. Oct. 25, 2023) (finding that limiting the RFC to simple, repetitive tasks is a CPP-based restriction); *Mitchell v. Kijakazi*, No. 19-cv-2560, 2021 WL 5310541, at *5 (D.D.C. Nov. 15, 2021) (finding that RFC restricting claimant to, among other things, "simple one to four step routine, repetitive tasks" was a limitation relevant to CPP, as was a restriction to "only occasional decision making"). Instead, Plaintiff acknowledges that the ALJ "include[d] additional limitations," but argues that the limitations were nearly identical to limitations the Court found lacking in other cases. ECF No. 12 at 18–19 (citing *Nsiah*, 2020 WL 12948519; *Shea M.*, 2023 WL 3040602; and *Yamise R.*, 2023 WL 7074088). Not so. Although it is true that this Court, in each of those cases, found that the RFC there failed to adequately account for those plaintiffs' moderate CPP limitations, those limitations were not "nearly identical" to the limitations imposed here. ECF No. 12 at 11; *see Shea M.*, 2023 WL 3040602, at *17–18 (finding limitations to "simple, routine, repetitive, low-stress" work insufficient to account for moderate CPP limitation); *Nsiah*, 2020 WL 12948519, at *8, *14–15 (finding limitations to "simple, routine, unskilled tasks" insufficient to account for moderate CPP limitation); *Yamise R.*, 2023 WL 7074088, at *10–11 (finding limitations to "simple tasks, decisions, and instructions, not performed in a fast-paced production environment, with simple being defined as the term is used in the DOT describing SVP levels 1 or 2" insufficient to account for moderate CPP limitation). The RFC here contains three distinct limitations in addition to simple, routine, repetitive tasks: a limitation to one-to-two step tasks, a limitation on the frequency of decisionmaking, and a limitation on the frequency of changes in the work setting.[15] *See* ECF No.

---

[15] The RFC also contains a fourth additional limitation: Plaintiff can only perform work that "would not require a fast pace or production quotas such as would customarily be found on an assembly line." ECF No. 6-2 at 23. The adequacy of this particular limitation has been previously considered by courts multiple times, with mixed results. *Contrast, e.g., Shea M.*, 2023 WL 3040602, at *19 (finding this limitation "not materially different . . . from RFC restrictions that this Court has rejected in the past as being insufficient to address a moderate CPP limitation" and "impermissibly vague"), *with Johnson v. Kijakazi*, No. 18-cv-2749, 2022 WL 2452610, at *3 (D.D.C. July 6, 2022) (finding a similar additional limitation acceptable and its meaning "readily discern[able]"). For the reasons described below, the Court

6-2 at 23 (limiting RFC to "simple 1-2 step, routine, repetitive tasks[,] . . . only occasional decision making and occasional changes in the work setting").  For the reasons stated below, these additional limitations are sufficient to account for Plaintiff's moderate CPP limitations.

First, the ALJ limited Plaintiff to "simple 1–2 step, routine, repetitive tasks."  ECF No. 6-2 at 23.  This Court has found that such a limitation is materially different than a limitation to "simple, routine, and repetitive tasks" because the limit on the steps "necessarily narrows the universe of tasks and jobs Plaintiff can perform to a small subset that demand reduced attention and concentration."  *Laura A. v. Kijakazi*, No. 21-cv-451, 2022 WL 3644810, at *12 (D.D.C. Aug. 24, 2022); *see also Yamise R.*, 2023 WL 7074088, at *11 ("[A]n ALJ can adequately account for a moderate CPP limitation, for example, 'by limiting the type of work and tasks the claimant can perform—such as, for example, simple and routine tasks or work that requires a limited number of steps.'" (quoting *Laura A.*, 2022 WL 3644810, at *11)).  After such a limitation is placed on a claimant, "[i]t is challenging for the Court to comprehend how tasks so limited in complexity would require levels of concentration exceeding Plaintiff's 'fair' (i.e., 'acceptable') ability to 'independently, appropriately, [and] effectively' concentrate, persist, and maintain pace 'on a sustained basis.'"  *Laura A.*, 2022 WL 3644810, at *12 (second alteration in original) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00f(2)(c)).  Or in other words, a "step" limitation sufficiently narrows an RFC to account for a plaintiff's inability to *sustain* concentration.  Further, the limitation to "1–2 step" simple tasks, here, is *more* restrictive than "step" limitations this Court and others have found sufficient in the past.  *See, e.g., Teresa D.*, 2025 WL 2255216, at *11 (limiting RFC to "simple one-to-four step" tasks); *Laura A.*, 2022 WL 3644810, at *11 (same); *Taft W.*, 2020 WL 7074628, at *3–4 (same); *cf. Pixley v. Kijakazi*, No. 23-cv-3626, 2024 WL 4019626, at

---

finds that, even if the limitation related to assembly-line pace were impermissibly vague, the other three additional restrictions, in combination, are sufficient to account for Plaintiff's moderate CPP limitations.

*7 (D.D.C. Sept. 3, 2024) (finding limitation to "simple one to four step routine repetitive tasks" sufficient when the record revealed that the plaintiff could sustain concentration despite her moderate CPP limitations).

Second, The ALJ provided a limitation on the amount of decision making in which Plaintiff can engage, restricting her to "only occasional decision making." ECF No. 6-2 at 23. Because "someone who, like Plaintiff, has problems concentrating would become overwhelmed in a work environment where they were required to make a high volume of decisions on a daily basis," this Court and others have repeatedly found that limiting a claimant to occasional decision making contributes to an RFC that adequately accounts for a claimant's CPP limitations. *Laura A.*, 2022 WL 3644810, at *13; *see, e.g.*, *Mitchell*, 2021 WL 5310541, at *5 (finding that a RFC limiting the claimant to, among other things, "occasional decisions" adequately accounted for the claimant's moderate CPP limitations); *Vernon O. v. Kijakazi*, No. 20-cv-3135, 2021 WL 3566742, at *4 (D. Md. Aug. 12, 2021) (noting that "a limitation to 'occasional decision-making' accounts for a claimant's moderate difficulties in concentration, persistence, and pace" (quoting *Green v. Berryhill*, No. 15-cv-3467, 2017 WL 1048155, at *8 (D. Md. Mar. 20, 2017))); *Smith v. Colvin*, No. 15-cv-234, 2016 WL 5718241, at *3 (W.D. Va. Sept. 30, 2016) (finding that limitations including "only occasional decision-making" and "only occasional changes in setting" sufficiently "account[ed] for [the plaintiff's] moderate limitation in concentration, persistence, and pace"); *cf. Shea M.*, 2023 WL 3040602, at *18 (finding RFC with no limitation on decisionmaking did not account for CPP limitations); *Nsiah*, 2020 WL 12948519, at *14–15 (similar).[16]

---

[16] Plaintiff points to *Yamise R.* as a case in which this Court found a similar RFC failed to account for that plaintiff's moderate CPP limitations. 2023 WL 7074088, at *11; *see* ECF No. 12 at 9–11. In *Yamise R.* the Court did, in fact, find that a restriction to "occupations not involving high levels of stress, such as those requiring independent decision making, or occupations subject to close supervision or close interaction with coworkers, or the general public, with close meaning no more than occasional" were "not materially different from RFC restriction that this Court has rejected in the past" and were therefore insufficient to account for moderate CPP limitations. 2023 WL 7074088, at *11. Nonetheless, the finding there is distinguishable. As to the decisionmaking restriction, a restriction to only

Third, the ALJ imposed restrictions on Plaintiff's work environment, limiting her to work where there would only be "occasional changes in the work setting, where there would only be occasional contact with co-workers and supervisors, and no contact with the general public." ECF No. 6-2 at 23. This Court and others have held that a limitation allowing only occasional changes in the work setting helps to adequately account for moderate CPP limitations, as it eliminates "constant distractions for an employee who struggles to concentrate and stay on task."[17] *Laura A.*, 2022 WL 3644810, at *13; *see, e.g.*, *Mitchell*, 2021 WL 5310541, at *5 (finding that a RFC limiting the claimant to, among other things, "occasional changes in the work setting" adequately accounted for the claimant's moderate CPP limitations); *Hunter v. Berryhill*, No. 17-cv-112, 2018 WL 310138, at *13 (E.D. Va. Jan. 5, 2018) ("By eliminating more than occasional changes in the workplace, and limiting [the p]laintiff to simple, routine tasks with no public interaction and only occasional interaction with supervisors and coworkers, the ALJ also properly accounted for her moderate difficulties with concentration and persistence."); *Linares v. Colvin*, No. 14-cv-120, 2015 WL 4389533, at *4 (W.D.N.C. July 17, 2015) (concluding that the ALJ "accounted for [the plaintiff's] limitation in concentration and persistence by restricting her to a stable work environment"); *Hanson v. Comm'r of Soc. Sec.*, No. 14-cv-561, 2015 WL 1637451, at *5 (S.D. Ohio Apr. 13, 2015) (recommending affirmance of ALJ's decision denying benefits where the ALJ "limited

---

"*occasional* decision making" is logically, substantively different than a restriction on "*independent* decision making." The first restricts the amount of decision making a plaintiff can maintain, while the later restricts the kind of decision making. Further, the ALJ in *Yamise R.* did not include a step limitation or "explain how [the] RFC is consistent with the claimant's trouble with concentration, persistence, or pace." 2023 WL 7074088, at *11. As explained, the RFC assessment here does not suffer those deficiencies. Further, the ALJ there found "somewhat persuasive" a psychological evaluation that found that plaintiff's psychiatric problems "may significantly interfere with [her] ability to function on a daily basis." *Id.* As such, the court there could not conclude that the error was harmless. *Id.* The ALJ made no such finding here.

[17] Although Plaintiff points to *Yamise R.*, this case is distinguishable for the reasons stated in Note 16, *supra*. Additionally, the ALJ there did not explicitly include a limitation to "occasional changes in the work setting" like the ALJ did here. *See Yamise R.*, 2023 WL 7074088, at *11.

[p]laintiff to work which involved only simple changes, recognizing that frequent or complex changes in the work environment would challenge someone who had difficulty maintaining attention and concentration"), *report and recommendation adopted*, 2015 WL 2085558 (S.D. Ohio May 5, 2015). Additionally, the ALJ limited Plaintiff's RFC to "only . . . occasional contact with co-workers and supervisors" and "no contact with the general public." ECF No. 6-2 at 23. This restriction also lessens potential distractions in the workplace. *See Hunter*, 2018 WL 310138, at *13; *Teresa D.*, 2025 WL 2255216, at *11 (finding similar limitation lessened the potential for distraction in the workplace); *cf. Shea M.*, 2023 WL 3040602, at *18–19 (finding that a similar limitation on interaction was "related to the CPP domain," but that the RFC in which it was included, which did not include an additional limitation on the number of steps in tasks, was insufficient overall).

Following the previous holdings of this Court and others, the additional limitation of the number of steps Plaintiff can perform, along with the limitations on the frequency of decision making and changes to her work environment, were sufficient to account for her moderate CPP limitations. *See Laura A.*, 2022 WL 3644810, at *12–13; *Teresa D.*, 2025 WL 2255216, at *12; *Mitchell*, 2021 WL 5310541, at *5; *Pixley v. Kijakazi*, No. 23-cv-3626, 2024 WL 4019626, at *5–6 (D.D.C. Sept. 3, 2024); *Taft W.*, 2020 WL 7074628, at *3–4; *Berrett v. Saul*, No. 19-cv-801, 2020 WL 4589733, at *4–6 (E.D. Va. July 23, 2020), *report and recommendation adopted*, 2020 WL 4589035 (E.D. Va. Aug. 10, 2020).

        2.    The ALJ Explained how the RFC Limitations Comport with Plaintiff's Moderate CPP Limitations

Plaintiff nonetheless argues that the ALJ failed to explain how these limitations comport with her moderate CPP limitations and, specifically, Plaintiff's ability to "*sustain* focused

attention."[18]  ECF No. 12 at 12; *see id.* (noting that "the ALJ did not mention Plaintiff's inability to stay on task in either of the hypothetical questions posed . . . and the RFC makes no mention of Plaintiff's mental limitations").

Lacking guidance from the D.C. Circuit on this issue, this Court has maintained an ALJ *can* properly account for even fewer CPP limitations than the ALJ proscribed here—such as, for example, restricting the claimant's RFC only to simple, routine and/or repetitive, unskilled tasks—*if* the ALJ "explain[s] how such an RFC is consistent with the claimant's trouble with concentration, persistence, or pace."  *Nsiah*, 2020 WL 12948519, at *15 n.4; *see also Demetria R.*, 2022 WL 3142376, at *16 n.16.  This Court has stated that an ALJ may "satisfy this requirement" by "point[ing] to facets of Plaintiff's life where [he or] she exhibits sustained focused attention, or testimony that [he or] she is capable of doing so."  *Yamise R.*, 2023 WL 7074088, at *11.  The ALJ must, as always, build an "accurate and logical bridge from the evidence to [his or her] conclusion" and explain why the claimant's ability to perform simple tasks is consistent with an ability to stay on task (i.e., concentrate and/or persist on a task).  *Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

Here, as noted, the ALJ explicitly laid out additional limitations in Plaintiff's RFC that account for her moderate CPP limitations.  Additionally, the ALJ supported Plaintiff's RFC

---

[18] The Court notes that Plaintiff *barely* makes this argument.  It is constricted to one paragraph which cites only one case as support.  *See* ECF No. 12 at 12.  And the quoted section of the case merely reiterates the proposition already discussed that "limiting Plaintiff's work to simple, routine, repetitive tasks does not adequately account for Plaintiff's moderate CPP limitations because 'the ability to perform simple tasks differs from the ability to stay on task.'"  *Id.* (quoting *Antonio W. v. Kijakazi*, No. 20-cv-1920, 2023 WL 3790700, at *25 (D.D.C. June 2, 2023)).  Generally, arguments that are not articulated will be deemed forfeited.  *See Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) ("We apply forfeiture to unarticulated [legal and] evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." (alteration in original) (quoting *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011))); *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))).  Nonetheless, the Court briefly addresses this argument because it fails anyway.

assessment with evidence that she is capable of "exhibit[ing] sustained focused attention" despite her moderate CPP limitation. *Yamise R.*, 2023 WL 7074088, at *11. For example, when finding the Plaintiff had a moderate CPP limitation, the ALJ noted that Plaintiff's "ability to maintain attention and concentration *varies* throughout the relevant period," stating that mental status examinations show "intact attention and concentration" despite her subjective allegations of concentration issues. ECF No. 6-2 at 22 (emphasis added). Later, the ALJ explicitly noted inconsistencies between "the relatively intact mental functioning consistently observed by her healthcare providers during appointments [and] . . . her subjective allegations in written form and in testimony." *Id.* at 28; *see also id.* at 26 ("The undersigned does note that the mental status examinations from Unity Health Care consistently observed 'good' judgment and insight, intact memory, and appropriate mood and affect, with no reference to psychotic symptoms during appointments."). In fact, the ALJ consistently stated in his decision that the Plaintiff's subjective assessments of her mental health are inconsistent with the medical evidence. *Id.* at 25–28. Further, the ALJ noted that the record includes evidence that Plaintiff "listen[s] to music," "watch[es] television," and "us[es] social media to access websites," all "activities [that] require some intact capacity to pay attention." *Id.*

For these reasons, and because Plaintiff failed to articulate any specific deficiencies in the ALJ's explanation, this argument fails.

3. Even if the ALJ Had Not Adequately Accounted for Plaintiff's CPP Limitations in her RFC, the Error Would be Harmless

Finally, even if Plaintiff had demonstrated that the ALJ failed to adequately account for her CPP limitations in the RFC assessment, the error would be harmless and would not require remand.

An ALJ's failure to adequately account for a claimant's CPP limitations is usually

25

considered harmless if "(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly accounted for a claimant's limitations in concentration, persistence, and pace.'" *Petty*, 204 F. Supp. 3d at 206 (citation modified) (quoting *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014)).

Any such alleged error here would be harmless under the first prong of *Petty*. First, the ALJ here explicitly limited the hypothetical provided to the vocational expert to include only un-skilled work. *See* ECF No. 6-2 at 31 (asking the VE to provide "unskilled work at all exertional levels"). In response, the VE testified that an individual with the Plaintiff's age, education, work experience, and RFC would be able to perform occupations such as Housekeeper, Field Crop Har-vest Worker, and Street Cleaner—each of which were classified as unskilled. *Id.*; *see also id.* at 53, 64–65 (VE testifying that all three jobs were unskilled, with level "1" in reasoning, math, and language). Second, there are numerous pieces of evidence in the record that demonstrate Plaintiff can engage in simple, routine tasks or unskilled work despite her CPP limitations. For example, there are repeated representations in Plaintiff's mental status examinations from The Ark of DC that her thought process was "logical," her thought content was "appropriate," her intelligence was "average," her insight was "fair," her judgment and attention were "within normal limits,"[19] and her memory was "intact," *see, e.g.*, ECF No. 7-4 at 5–6, 10–11, 15, 19 (citation modified), *see also* ECF No. 7-5 at 91, 130 (similar from MBI Health Services); a medical finding from the Ark of DC on November 11, 2022, that Plaintiff "is able to follow simple instructions," ECF No. 7-4 at

---

[19] The notation on Plaintiff's mental status examinations is "WNL." *See, e.g.*, ECF No. 7-4 at 5–6, 10–11, 15, 19. This acronym stands for "within normal limits." *See WNL, Medical Dictionary*, The Free Dictionary, https://perma.cc/4Z3U-TKLD.

24; repeated representations from Unity Health Care that Plaintiff "demonstrates good judgment and insight," *id.* at 36, 40, 46, 49, 54, 58; and Plaintiff's representations that she was able to listen to music, watch television, and use social media, *see* ECF No. 7-2 at 384, ECF No. 7-3 at 19, ECF No. 7-4 at 45 (representing that she did "[n]ot at all" have "[t]rouble concentrating on things, such as reading the newspaper or watching television").

For these reasons, even if the ALJ had improperly accounted for Plaintiff's moderate CPP limitations in her RFC, the error would be harmless.

### B.    The ALJ Set Forth a Narrative Discussion that Shows How Specific Evidence Supported his RFC Assessment

Plaintiff argues that the ALJ "failed to set forth a narrative discussion setting forth how the evidence supported each conclusion, citing specific medical facts and nonmedical evidence." ECF No. 12 at 12 (emphasis omitted). She takes specific issue with the fact that the ALJ "did not . . . endeavor to explain how he determined . . . the Plaintiff's . . . limitations" and did not "tie any particular piece of evidence to any limitation contained in the residual functional capacity assessment." *Id.* at 12–13. In other words, Plaintiff argues that the ALJ failed to create a "logical bridge" between the evidence and his RFC determination. *See id.* at 13 (quoting *Jackson v. Kijakazi*, No. 18-cv-912, 2022 WL 2981768, at *14–18 (D.D.C. July 28, 2022)). The Commissioner argues this argument is "misguided because the ALJ discussed the medical evidence in detail and explained that [Plaintiff's] conservative course of treatment," her "normal mental status examination findings, . . . her education history and ability to read, and her reports . . . all" supported the RFC assessment. ECF No. 15 at 18–16. For the reasons stated below, the Court agrees with the Commissioner—the ALJ sufficiently composed a narrative discussion that established a logical bridge between the evidence in the record and his RFC determination.

Beyond merely "consider[ing] all evidence in the administrative record when reaching a conclusion regarding a plaintiff's disabilit[y]," the ALJ "must compose a 'narrative discussion'" that "construct[s] a 'logical bridge' connecting the ALJ's conclusions to the evidence of record." *Gause v. Saul*, No. 18-cv-443, 2019 WL 12251880, at *10 (D.D.C. Sept. 30, 2019) (first quoting SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 1, 1996), and then quoting *Lane-Rauth*, 437 F. Supp. 2d at 67), *report and recommendation adopted*, 2019 WL 12251885 (D.D.C. Oct. 22, 2019); *see also Butler*, 353 F.3d at 1000 ("[The ALJ's decision] must contain a 'narrative discussion' identifying the evidence that supports each conclusion." (quoting SSR 96-8p, 1996 WL 374184, at *7)); *Contreras v. Comm'r of Soc. Sec.*, 239 F. Supp. 3d 203, 209 (D.D.C. 2017) (same). That is, the ALJ must "build an 'accurate and logical bridge from the evidence to [her] conclusion'" so that a reviewing court can "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Scott*, 297 F.3d at 595). But an ALJ does not create a logical bridge by merely summarizing the evidence. *See, e.g.*, *Jackson*, 2022 WL 2981768, at *6–7 ("Although the ALJ summarizes the plaintiff's medical history, the summary alone is insufficient[.]" (internal citation omitted); *Williams v. Colvin*, 134 F. Supp. 3d 358, 363–64 (D.D.C. 2015) ("It is insufficient for the ALJ to merely list the claimant's medical history and then conclusively state the claimant's RFC."). Instead, the ALJ must "explain[] which evidence he found credible and why." *Nsiah*, 2020 WL 12948519, at *13 (quoting *Pinkney*, 675 F. Supp. 2d at 17). Further, "if there is conflicting evidence in the record, or if an ALJ discounts evidence in the record for any other reason, the ALJ must weigh and discuss that evidence to provide a rationale as to why the evidence was rejected or given little weight." *Id.*

To start, to the extent Plaintiff argues that the ALJ was required to complete a function-by-function analysis, *see* ECF No. 17 at 3 (arguing that the ALJ "failed to tie any particular piece of

evidence to any limitation contained in the [RFC] assessment"), she is incorrect. That position has been consistently rejected by this Court and others: Although the language of SSR 96–8p requires that the ALJ's RFC assessment "must be based on *all* of the relevant evidence in the case record" and "*must address* both the . . . exertional and nonexertional capacities of the individual," SSR 96-8p, 1996 WL 374184, at *5, "this does not require written articulation" tying specific pieces of medical and nonmedical evidence to each limitation; instead, "[t]he narrative discussion requirement simply requires the ALJ to explain an 'individual's ability to perform sustained work activities in an ordinary work setting on a regular [and continuing] basis,' and 'describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.'" *Banks v. Astrue*, 537 F. Supp. 2d 75, 85 (D.D.C. 2008) (quoting SSR 96-8p, 1996 WL 374184, at *7)); *see also Contreras*, 239 F. Supp. 3d at 207 ("This court has found that when 'the ALJ provided a thorough narrative discussion of [Plaintiff's] limitations,' and has built a 'logical bridge' from the evidence to his conclusion, the RFC analysis does not require 'written articulation of all seven strength demands.'" (quoting *Banks*, 537 F. Supp. 2d at 85)); *Nsiah*, 2021 WL 372784, at *14 ("[A] narrative discussion 'is sufficient for the ALJ to fulfill [his] obligation to complete a function-by-function analysis that allows the [court] to conduct meaningful review.'" (quoting *Davis v. Berryhill*, 272 F. Supp. 3d 154, 172 (D.D.C. 2017)); *Simmons v. Saul*, No. 18-cv-1293, 2019 WL 12251882, at *13 (D.D.C. Sept. 30, 2019) ("To the extent that Plaintiff argues that the absence of explicit and separate evaluations of each of the relevant strength categories in itself requires remand (or reversal), he is mistaken."), *report and recommendation adopted*, 2019 WL 12251883 (D.D.C. Oct. 22, 2019). The ALJ met that standard here.

As discussed, the ALJ assigned to Plaintiff's RFC the following nonexertional

limitations:[20]

> the performance of simple, 1-2 step routine, repetitive tasks, in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, where there would only be occasional contact with co-workers and supervisors, . . . no contact with the general public, and which would not require a fast pace or production quotas such as would customarily be found on an assembly line.

ECF No. 6-2 at 23.  The ALJ's logical bridge between the evidence of record, Plaintiff's nonexertional limitations, and Plaintiff's RFC consisted primarily of a comparison between Plaintiff's subjective assertions about her mental health symptoms and capabilities and the objective medical evidence.  ECF No. 6-2 at 23–30.  On the whole, the ALJ concluded that the inconsistencies in Plaintiff's statements about her symptoms, in combination with medical evidence reporting only moderate mental limitations and conservative mental health treatment, showed that the "intensity, persistence, and limiting effect of . . . [Plaintiff's] symptoms" were less severe than Plaintiff subjectively reported and were accounted for in her RFC assessment.  *Id.* at 25; *see also id.* at 27 (noting a "pattern in the records" that Plaintiff's "reports of symptoms in terms of duration, severity, [and] frequency, are largely in excess of the degree of limitation observed by her healthcare providers in their respective examinations").  Specifically, the ALJ noted that Plaintiff's "statements about the intensity, persistence, and limiting effects of [her] symptoms" were not entirely supported by "the mental status examination findings, [her] PHQ-2 and PHQ-9 scores, and the observations of her healthcare providers," citing medical observations from United Medical Center and Unity Healthcare from 2019 to 2023, which described Plaintiff's psychiatric demeanor as

---

[20] The ALJ found that Plaintiff could "work at all exertional levels."  *See* ECF No. 6-2 at 23; *see also id.* at 31 (noting that Plaintiff's "ability to perform work at all exertional levels has been compromised by nonexertional limitations").  Plaintiff does not challenge this finding, but instead argues only that the ALJ erred in assessing her mental limitations.  *See generally* ECF No. 12; ECF No. 17; *see also* ECF No. 16 at 4 n.3.  As such, Plaintiff has forfeited any argument contesting the ALJ's exertional findings.  *See Jones*, 835 F.3d at 83; *Siataga v. Saul*, No. 19-cv-768, 2020 WL 6263926, at *7 n.5 (D.D.C. Aug. 20, 2020) (treating arguments not raised in initial motion or reply as forfeited).

"appropriate" and "cooperative," reported "no [psychiatric] symptoms," and indicated no depression or minimal depression.  ECF No. 6-2 at 25 (citing ECF No. 7-2 at 337–67, 995–97; ECF No. 7-3 at 377–83; ECF No. 7-4 at 45, 48, 52, 56, 63, 66)); *see also id.* at 26 (noting that Plaintiff's responses to a PHQ in 2022 resulted in a score of 0, indicating "no depression," and responses to PHQs in 2023 found only "minimal depression").

Additionally, the ALJ found that Plaintiff made several inconsistent statements, which he relied upon to further discredit her assertions about the intensity, persistence, and limiting effects of her symptoms.  *See generally id.* at 26–29; *see, e.g.*, *id.* at 27 (noting that although Plaintiff represented that she "has not left her home 'since the pandemic started,'" the record shows that she "reported going out on [F]ather's [D]ay in 2021," later alleged that she "spent all day in bed," and then later testified that she "paced" all day).  For example, he found that Plaintiff's statements about her symptoms and diagnoses were inconsistent ("not entirely clear").  *Id.* at 25.  He specifically noted one instance when she said she was diagnosed with schizophrenia in 2018, later stated that she was diagnosed in 2013, and then later, in 2020, stated she had never received mental health services before.  *Id.*  He noted that her statements about psychiatric hospitalizations were similarly inconsistent.  *Id.*  For example, in 2020, Plaintiff stated she had been hospitalized for two months "years ago" for cutting her wrists, but, in 2020, stated she was only hospitalized overnight.  *Id.*  Further, the ALJ found these statements inconsistent with the medical evidence, which showed no history of psychiatric hospitalization.  *Id.*  He similarly found Plaintiff's statements regarding her claim that she experiences both auditory and visual hallucinations inconsistent—although she complained of delusions and hallucinations to medical providers at MBI Health Services and The Ark of DC, the ALJ found that her "mental status examinations from Unity Health Care [did] not corroborate [these] allegations" and, instead, consistently observed good judgment with no

reference to psychotic symptoms. *Id.* at 25–26 (citing ECF No. 7-1 at 14 (Unity Health Care mental status examination stating "patient demonstrated good judgment and insight, [a]lert and oriented to time, place and person[,] [a]appropriate mood and affect[, and] [r]ecent and remote memory intact"), *and* ECF No. 7-4 at 58 (same)).  Similarly, records from United Medical Center noted that Plaintiff made no complaints of psychiatric symptoms. *Id.* at 26 (citing ECF No. 7-1 at 35–36 (noting that "no [psychiatric] symptoms [were] reported" and noting Plaintiff's "[p]sychiatric" was "appropriate, cooperative").

The ALJ found that evidence showing Plaintiff's "conservative treatment in response to her mental health complaints, the lack of hospital visits[,] and/or hospitalizations arising from symptoms of her mental impairments" was relevant. *Id.* at 27.  He noted that, although Plaintiff at times sought emergency medical treatment for conditions resulting in physical discomfort, she never sought emergency medical care for psychiatric symptoms. *Id.* at 26.  He also noted that "evidence shows that [Plaintiff] reported her medications were effective . . . and that she wanted to keep taking them." *Id.* at 27.  He concluded that this evidence together indicated that Plaintiff's "severe medically determinable mental impairments respond to treatment and are controllable so long as she complies with her prescribed treatment." *Id.* at 27; *see id.* at 28 (noting that "evidence of record generally supports that . . . the claimant experience improvement resulting from her prescribed treatment."); *see also Neil F. v. Comm'r of Soc. Sec.*, No. 21-cv-56, 2022 WL 1311695, at *10 (E.D. Va. Feb. 15, 2022) ("If a plaintiff requires only 'conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is.'" (quoting *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015))), *report and recommendation adopted*, 2022 WL 1304540 (E.D. Va. May 2, 2022).

As to conflicting evidence, the ALJ acknowledged that Plaintiff's impaired memory testing evidence showed "poor" to "fair" ratings for insight and judgment and stated these limitations were accounted for in Plaintiff's RFC, specifically in the finding that Plaintiff had "moderate" limitation in functioning.  ECF No. 6-2 at 26.  He also acknowledged the prior ALJ decision and noted that in both hearings Plaintiff consistently "alleged disabling psychiatric complaints resulting in an inability to perform activity of daily living or work."  *Id.* at 28.  Although the ALJ noted he "does not question the fact that [Plaintiff's] relatives perform a variety of tasks for her," he nonetheless determined that record evidence was "inconsistent with [her] assertion that she [is] unable to per-form any of the activities that she has her relatives perform on her behalf."  *Id.*  Similarly, he found that the record evidence did "not clearly establish that [Plaintiff] is unable to go outside; [but] rather, [that] she has others go on her behalf."  *Id.*  The ALJ pointed to the fact that Plaintiff went out on Father's Day in 2021 to "contradict" her claim that she does not leave the house, *id.*, and noted that the "objective medical evidence suggests that her non-performance of [daily activities] may be voluntary," *id.*; *see also id.* ("[T]he record evidence does not establish that she would not be able to perform those activities, if she was unable to avail herself of the assistance of her various relatives.").  He concluded that he

> highlight[ed] the foregoing instances of inconsistencies in the record, including the conflicts between the claimant's testimony during the August 30, 2023 hearing and her statements during medical appointments[,] the written remarks in the function reports versus her testimony, and the relatively intact mental functioning consist-ently observed by her healthcare providers during appointments in comparison with her subjective allegations in written from and in testimony, in order to clearly ar-ticulate . . . that the undersigned considered all factors required . . . and arrive[d] at the conclusion that the intensity, persistence, and limiting effects of the symptoms subjectively alleged by the claimant are inconsistent with the objective medical ev-idence and the other evidence.

*Id.*

The ALJ further found that "the medical opinions and prior administrative medical

findings" were consistent with only "moderate" limitations. *Id.* at 29. He specifically cited the evaluation of the initial state agency psychological consultant, Dr. Heiser, who found that Plaintiff's psychiatric conditions resulted in "moderate" criteria B limitations, *id.*; Dr. Cott's evaluation, which affirmed Dr. Heiser's opinion, *id.*; and the state agency medical consultants'—Doctors Nelson-Desiderio's and Haim's—evaluations, which found Plaintiff's physical conditions did not result in more than a "minimal limitation in [her] ability to perform basic, work related activities." *Id.* The ALJ found each of these evaluations persuasive. *Id.*

This reasoning provides a sufficient logical bridge between the medical and nonmedical evidence and the RFC limitations the ALJ imposed. *See* ECF No. 6-2 at 23–30. The ALJ's decision did not merely list the evidence that informed his conclusion, but instead "explained which evidence he found credible and why." *Nsiah*, 2020 WL 12948519, at *14 (quoting *Pinkney*, 675 F. Supp. 2d at 17). Specifically, he weighed the medical record against Plaintiff's subjective complaints and reasoned that the inconsistencies throughout supported only "moderate" nonexertional limitations, which were accounted for in the RFC. Additionally, he reasoned that Plaintiff's "conservative treatment" of mental health complaints and the prior administrative medical findings supported only "moderate" limitations.

### C.    The ALJ Failed to Directly Address Plaintiff's Inability to Leave her Home Due to Anxiety in his RFC Assessment, but This Error is Harmless

Finally, Plaintiff argues that the ALJ did not address "how the limitations contained in his [RFC] assessment address[ed] the Plaintiff's primary mental health difficulty: leaving her home due to anxiety." ECF No. 12 at 15–16. The Commissioner does not directly address this argument.[21] *See generally* ECF No. 16. Instead, the Commissioner generally argues that that there is

---

[21] Plaintiff argues that the Commissioner's failure to respond means he concedes that the ALJ failed to adequately address the significant evidence of Plaintiff's anxiety, and as such the case should be remanded. *See* ECF No. 17 at 2 ("The Defendant has failed to address this argument in any manner, apparently conceding that the [ALJ] had failed to

substantial evidence in the record to support the ALJ's RFC assessment.  *Id.* at 9–12; *id.* at 10 ("[A]s discussed by the ALJ, despite alleging disabling mental limitations, Plaintiff underwent only conservative mental health treatment that showed largely normal mental status examination findings, and she routinely expressed the desire to find sustainable and consistent employment."). The Commissioner also argues that "the ALJ is not required to 'recite every piece of evidence that contributed to the decision, so long as the record permits us to glean the rationale of his decision.'" ECF No. 16 at 17 (citation modified) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013)).

"[A]n ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."  *Demetria R.*, 2022 WL 3142376, at *11 (internal quotation marks omitted) (quoting *Dicks v. Colvin*, No. 15-cv-934, 2016 WL 4927637, at *4 (M.D. Fla. Sept. 16, 2016)).  However, it is also well-established that "an ALJ is not required to discuss every piece of evidence submitted." *Taylor v. Berryhill*, No. 18-cv-316, 2019 WL 5540844, at *10 (D.D.C. Aug. 2, 2019) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)), *report and recommendation adopted*, 2019 WL 5538560 (D.D.C. Oct. 25, 2019); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."); *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) (holding that the ALJ is not required to discuss every piece of evidence); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994)

---

adequately address the significant evidence of the Plaintiff's anxiety and panic when leaving her home, and that the [ALJ's] reliance upon the Plaintiff's attendance at a Father's Day celebration to discount the Plaintiff's anxiety was based upon an erroneous reading of the evidence.").  Although it may be true that the Commissioner failed to address this argument, the Court will not remand an ALJ's decision simply due to a briefing error—"remand is inappropriate where it would be an idle and useless formality." *See Gordon v. Colvin*, No. 15-cv-1028, 2016 WL 6088263, at *15 (D.D.C. Sept. 30, 2016) (citation modified) (quoting *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009)).  As explained below, although the ALJ did not directly address his decision not to include a limitation involving Plaintiff's inability to leave her home in his RFC, he considered much of the evidence Plaintiff points to.  Further, any error is harmless because the ALJ's decision is supported by substantial evidence.

("[A] written evaluation of each piece of evidence or testimony is not required . . . ."); *Sito v. Comm'r of Soc. Sec.*, 229 F. Supp. 3d 633, 644 (N.D. Ohio 2017) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (quoting *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Further, an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered in a Social Security disability case." *Charles v. Astrue*, 854 F. Supp. 2d 22, 30 (D.D.C. 2012). Nonetheless, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's positions." *Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)). But, ultimately, an ALJ "is only prohibited 'from ignoring an entire line of evidence that supports a disability finding.'" *Goodman v. Colvin*, 233 F. Supp. 3d 88, 109 (D.D.C. 2017) (quoting *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2013)). Additionally, to warrant remand, the omission of evidence must be material to the ALJ's decision or prejudicial to Plaintiff, as "[r]emand is inappropriate where it 'would be an idle and useless formality.'" *Gordon*, 2016 WL 6088263, at *15 (quoting *Rabbers.*, 582 F.3d at 654); *see also Saunders*, 6 F.4th at 4 (describing the harmless-error rule). Each of these rules comport with a guiding principle of Social Security law: an ALJ's decision need not be perfect, so long as it is backed by substantial evidence. *See Butler*, 353 F.3d at 999; *Schreiber v. Colvin*, 519 F. App'x 951, 962 (7th Cir. 2013) ("To be sure, as we have indicated, the ALJ's decision was not perfect. But it was supported by substantial evidence, and we must nevertheless affirm the denial of benefits . . . ."); *Shea M.*, 2023 WL 3040602, at *13 ("The Commissioner's findings must be upheld if they are 'supported by substantial evidence and not tainted by an error of law.'" (quoting *Ali v. Colvin*, 236 F. Supp. 3d 86, 90 (D.D.C. 2017))).

Helpfully, Plaintiff has identified the records she believes the ALJ erroneously disregarded relating to her assertion that she cannot leave her home due to anxiety. *See* ECF No. 12 at 16–18. Largely, Plaintiff points to her own testimony or representations she has made to medical providers and social workers. *See id.* For example, Plaintiff notes that she testified at the hearing held on August 30, 2023, that she could not leave her home. *See* ECF No. 6-2 at 56 (Plaintiff testifying "I'm not even going out there. . . . I do not go out this door[,]" in response to a question about her leaving her home); *id.* at 57 (Plaintiff testifying that she "[doesn't] go out this door" because of her hallucinations); *id.* at 60 (Plaintiff testifying that she "can't [] go outside" and "I'm scared"); *id.* at 62–63 (Plaintiff testifying "I haven't" when asked if she has "[gone] out of [her] house in over two years"); *see also id.* at 49–50 (Plaintiff's attorney asserting that Plaintiff is "unable to step outside the place where she's living," "does not go outside," and "[d]oes not go outside because she'd afraid of getting shot"). Plaintiff also points to the following representations. First, in her Disability Appeal and Request for Hearing, filed on May 5, 2022, she noted "I can't . . . go outside." ECF No. 6-4 at 21. In her Function Report, completed January 26, 2022, she similarly noted "I don't go outside." ECF No. 7 at 19. Plaintiff also made multiple reports to social workers at MBI Health Services involving her fear of going outside. *See, e.g.*, ECF No. 7-2 at 121 (Plaintiff reporting "I don't come outside" on July 31, 2019); *id.* at 36 (social worker noting that Plaintiff had "increase[d] hesitation to go outside" and Plaintiff reporting "long history of deep fears of being outside" on January 30, 2020); *id.* at 8 (Plaintiff reporting "ongoing difficulties of going outside" on March 10, 2020); *id.* at 30 (Plaintiff reporting "ongoing fears of going outside" on February 11, 2020); *id.* at 371 (Plaintiff reporting "ongoing anxiety causing [her] to stay home all weekend" on September 13, 2021); ECF No. 7-5 at 125 (Plaintiff reporting "trying to maintain the voices, so when I go outside I don't have a panic attack"); ECF No. 7-3 at 46 (Plaintiff reporting

"extreme anxiety moods when she tries to go outside" on May 10, 2021); *id.* at 106–07 (Plaintiff reporting "ongoing anxiety barriers of going outside" on December 21, 2020); *see also id.* at 196, 207, 243, 267; ECF No. 7-5 at 43–44. Similarly, Plaintiff repeatedly told practitioners at the Ark of DC that she cannot go outside. *See, e.g.*, ECF No. 7-4 at 22 (Plaintiff reporting she "cannot go outside because she is afraid of getting shot" on November 21, 2022); *id.* at 10–11 (Plaintiff reporting "panic[king] when she goes outside" and that "she does not want to go outside because she thinks something bad will happen" on May 9, 2023); *id.* at 15 (Plaintiff reporting "panic attacks and paranoia when she tries to step outside her house" on July 17, 2023).

The first thing to note is, to the extent Plaintiff is arguing the ALJ did not consider *at all* the Plaintiff's inability to go outside, that is incorrect. He explicitly considered it throughout his decision. For example, the ALJ considered her inability to leave her home in reference to her testimony that she did not perform any daily activities—he noted that Plaintiff stated during the August 30, 2023, hearing that "her relatives perform [daily] tasks because she cannot leave her home," although he noted that she had previously indicated that she "used public transportation and shopped in stores." ECF No. 6-2 at 21. Further, the ALJ explicitly considered many of the records to which Plaintiff points. *See id.* at 21–30. For example, he noted that Plaintiff's January 2022 Function Report "purports that she does not leave her home," *id.* at 22 (citing ECF No. 7 at 19, 16–23), and explicitly noted on multiple instances that Plaintiff testified at the August 30, 2023, hearing that she did not leave her home, *see id.* at 24 (noting that Plaintiff "alleged . . . an inability to leave her home"); *id.* (noting that Plaintiff "initially testified that she has not left her home since 'the pandemic started,'" but "[l]ater . . . claimed she had not been out of her home since 2021"); *id.* at 27 ("[T]he claimant testified that she does not leave her home."). Further, the ALJ cited medical evidence from both MBI Health Services, *see, e.g.*, *id.* at 20–22, 24–27, 30 (citing ECF

No. 7-2 at 121–263; and ECF No. 7-3 at 14–23)[22]; and the Ark of DC, *see, e.g.*, *id.* at 20–22, 24, 26–27, 30 (citing ECF No. 7-4 at 5–24).[23]  It is true, the ALJ did not tend to cite the MBI Health Services records and the Ark of DC records for the proposition that Plaintiff would have liked— that Plaintiff had continuing issues with leaving her home due to anxiety.  Instead, the ALJ used them to support his findings related to Plaintiff's severe impairments, *see* ECF No. 6-2 at 20, and his RFC assessment, *see* ECF No 6-2 at 21–30.  For example, the ALJ explicitly relied on these records to support his findings that Plaintiff has moderate limitations in understanding, remembering, and applying information, *id.* at 21–22; interacting with others, *id.* at 22; concentrating, persisting, or maintaining pace, *id.*; and adapting or managing oneself, *id.*  Even considering that "an ALJ's failure to cite specific evidence does not indicate that it was not considered," *Simons*, 114 F. App'x at 733, it is difficult to argue that the ALJ ignored records that he explicitly cited in his decision.  As such, the ALJ at least "minimally discuss[ed]" the evidence to which Plaintiff points. *See Demetria R.*, 2022 WL 3142376, at *11.

Nonetheless, the ALJ did not address in detail why he discredited Plaintiff's testimony on this point or her consistent reports to social workers and medical providers or why he did not include a limitation on Plaintiff's ability to leave her home in his RFC assessment.  *See generally* ECF No. 6-2.  When the ALJ *did* directly discredit Plaintiff's assertions that she cannot leave her home, he primarily relied on evidence that Plaintiff reported leaving her home once in 2021 to celebrate Father's Day.  *See, e.g.*, *id.* at 27, 28 (citing ECF No. 7-3 at 23).  Specifically, the ALJ pointed to a report from MBI Health Services on June 18, 2021, in which the social worker noted that he "applauded [Plaintiff] and reviewed benefits of going out to celebrate Father's Day with

---

[22] Records from MBI Health Services are referred to as Exhibit B3F in the administrative record.  *See* ECF No. 7-2 at 1; ECF No. 7-3 at 1.

[23] Records from the Ark of DC are referred to as Exhibit B7F in the administrative record.  *See* ECF No. 7-4 at 1.

family for getting to go outside more," and noted that Plaintiff "offered insight into looking forward [to] a family outing this weekend for [Father's Day's] celebration." ECF No. 7-3 at 23. Although this Court has found that it is reasonable for an ALJ to discount a Plaintiff's testimony when it is contradicted by record evidence, *see Shea M.*, 2023 WL 3040602, at *16 (discounting the plaintiff's testimony that she did not go on a beach trip when medical records reported that the plaintiff said she was "doing good" and "went to Myrtle Beach for [her] birthday"), Plaintiff argues that the evidence relied upon does not in fact contradict her testimony. *See* ECF No. 12 at 18 n.2. Plaintiff contends that the record instead indicates "only that [Plaintiff] had the opportunity to [go out for Father's Day]." ECF No. 12 at 18 n.2. Plaintiff notes that although this report stated that the social worker "applauded [Plaintiff] and reviewed benefits of going out to celebrate Father's Day," the report was taken on June 18, 2021, two days before Father's Day, June 20, 2021. *Id.* This implies that the social workers' "applause" was forward looking and suggests that the ALJ misconstrued this evidence. Without deciding the truth of the matter, the Court will assume that the ALJ erred in relying so heavily on the June 18, 2021, report to discredit Plaintiff's assertions that she cannot leave her home. But, as explained below, any error in that regard would be harmless.

Although it is true that the Court may remand a case to the SSA because the ALJ "mischaracterized" evidence, *see, e.g.*, *Stubbs v. Saul*, No. 18-cv-1457, 2020 WL 1893173, at *7 (D.D.C. Mar. 23, 2020); *see also Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (similar), remand is only required if the error was prejudicial and affected the disposition of the claim, *see Katrina M. v. O'Malley*, 752 F. Supp. 3d 1, 11 (D.D.C. 2024); *see also Gordon*, 2016 WL 6088263, at *15 ("Remand is inappropriate where it 'would be an idle and useless formality.'" (quoting *Rabbers*, 582 F.3d at 654). Here, assuming an error occurred it is neither prejudicial nor affected the

disposition of the claim because the ALJ's RFC assessment, and ultimate finding of no disability, is supported by substantial evidence.

The June 18, 2021, report indicating Plaintiff may have gone out on Father's Day 2021, was just one piece of the larger body of evidence the ALJ relied on to support his decision that Plaintiff had only moderate mental health limitations.  *See, e.g.*, *Tyrone G. v. O'Malley*, No. 22-cv-3037, 2024 WL 1509026, at *12 (D.D.C. Feb. 16, 2024) (discounting the plaintiff's argument that the ALJ mischaracterized evidence about her activities of daily living because "the ALJ did not rely on [the plaintiff's] reports of his activities of daily living in a vacuum," but instead used that evidence to support other opinions and evidence he relied on in the record).  As stated above, the ALJ's RFC decision is otherwise supported by substantial evidence, including medical records showing Plaintiff's history of conservative treatment of mental health symptoms, *see* ECF No. 6-2 at 27; that the treatment alleviated her symptoms, *see id.*; that Plaintiff sought emergency medical treatment for physical, but not psychiatric symptoms, *see id.* at 26; and the absence of any hospitalization for psychiatric issues, *see id.* at 23, 25, 27.  Further, although the ALJ may not have directly discredited evidence regarding Plaintiff's inability to go outside due to anxiety, the ALJ noted throughout his opinion that there was a pattern of Plaintiff overstating her symptoms, inconsistently reporting the severity of her mental health symptoms to her medical providers, and Plaintiff's symptom reports not matching the health evaluations in the record.  *See id.* at 23–30.

In fact, the ALJ's decision is replete with indications that he found Plaintiff's testimony relating to the severity of her symptoms not credible when compared to the rest of the record.  *See id.*  Credibility determinations are solely within the realm of the ALJ.  *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012); *see also Louis C. v. O'Malley*, No. 24-cv-363, 2024 WL 5484077, at *6 (D.D.C. Dec. 16, 2024) ("The reviewing court may neither reweigh the evidence

presented to it nor replace the Commissioner's judgment 'concerning the credibility of the evidence with its own.'" (quoting *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995)).  In determining whether the ALJ made a proper credibility assessment, a court will consider whether the ALJ weighed the following factors:

> 1) [t]he individual's daily activities, 2) [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms, 3) [f]actors that precipitate and aggravate the symptoms, 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms, 5) [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms, 6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . and 7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Grant*, 857 F. Supp. 2d at 156 (alterations in original) (quoting SSR 96-7p, 1996 WL 374186 (S.S.A. July 3, 1996)); *see also* SSR 16-3p, 2017 WL 5180304, at *7–8 (S.S.A. Oct. 25, 2017) (same).

Here, the ALJ's decision considered each of those factors.  The ALJ considered Plaintiff's assertions that she did not perform any daily activities, but generally found these assertions—when viewed against medical evidence in the record—supported only that Plaintiff's relatives performed these activities for her, not that she was incapable of performing them.  *See, e.g.*, *id.* at 28 ("[T]he undersigned does not question the fact that the claimant's relatives perform a variety of tasks for her.  The undersigned simply notes that the degree of limitation supported by the mental status examinations in the record and the observations of the medical and mental healthcare providers are inconsistent with [her] assertion that she [is] unable to perform any of the activities she has her relatives perform on her behalf.").  He considered Plaintiff's objective reports of her symptoms, stating that they were often inconsistent, but when consistent with the medical records supported a finding of only moderate mental health limitations.  *See, e.g.*, *id.* at 21–23.  As discussed

previously, he assessed Plaintiff's treatment, finding it "conservative," *id.* at 27, and assessed the medical evidence in the record, which largely found Plaintiff's mental health symptoms to be less severe than she testified to at the August 30, 2023, hearing, *id.* at 23–30. Based on the ALJ's thorough assessment of the record evidence, the undersigned cannot say that the ALJ's credibility assessment was erroneous. *See Bryant v. Saul*, No. 16-cv-2196, 2019 WL 6619760, at *10 (D.D.C. Nov. 18, 2019) ("An ALJ's credibility determination must be 'based on the whole record and explained in his decision.'" (quoting *Carnett v. Colvin*, 82 F. Supp. 3d 1, 16 (D.D.C. 2015)). After all, "credibility determinations are 'solely within the realm of the ALJ.'" *Moore v. Berryhill*, 313 F. Supp. 3d 275, 283 (D.D.C. 2018) (quoting *Callaway v. Berryhill*, 292 F. Supp. 3d 289, 297 (D.D.C. 2018)). "[A] reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding." *Id.* (quoting *Callaway*, 292 F. Supp. 3d at 297). That is not the case here.

Finally, to the extent Plaintiff argues that substantial evidence in the record exists supporting her inability to go outside and, as such, the ALJ should have found her to be disabled, this misconstrues the standard of review that guides this Court. "The question is not . . . whether substantial evidence supports Plaintiff's position, but rather, whether there is 'such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's conclusions.'" *Shea M.*, 2023 WL 3040602, at *13 (citation modified) (quoting *Ali*, 236 F. Supp. 3d at 90). "That is, 'if supported by substantial evidence, the Commissioner's findings must be sustained 'even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the Commissioner's.'" *Id*. (citation modified) (quoting *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)); *see also Morales v. Berryhill*, 484 F. Supp. 3d 130,140 (S.D.N.Y. 2020) ("Even where the administrative record may also adequately

support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010))); *Kober v. Apfel*, 133 F. Supp. 2d 868, 873 (W.D. Va. 2001) ("The Commissioner's decision, 'if supported by substantial evidence, must be affirmed even though the reviewing court believes that substantial evidence also supports a contrary result.'" (quoting *Estep v. Richardson*, 459 F.2d 1015, 1017 (4th Cir. 1972))).  As explained above, the ALJ's decision is supported by substantial evidence, even without consideration of whether Plaintiff may or may not have gone outside her home on Father's Day 2021.  Thus, any error that may have occurred with respect to the ALJ's consideration of that evidence was not prejudicial, did not affect the disposition of the claim, and provides no basis for remand.

## IV.    CONCLUSION

For the reasons stated herein, an order will be issued reflecting that Plaintiff's motion for judgment of reversal, ECF No. 12, is **DENIED** and Defendant's motion for judgment of affirmance, ECF No. 15, is **GRANTED**.

Date: September 18, 2025

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE